(C.D. 2598)

RAILWAY EXPRESS AGENCY, INC., A/C AIRESEARCH MANUFACTURING CO. v. UNITED STATES

---

## United States Customs Court, Second Division

(Decided December 8, 1965)

*Stein & Shostak* (*S. Richard Shostak* and *Marjorie M. Shostak* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Richard J. Kaplan*, trial attorney), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: This suit is brought against the action of the collector of customs at Los Angeles, Calif., pursuant to 19 U.S.C., section 1514 (section 514 of the Tariff Act of 1930), in classifying certain components for computers under the provisions of paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and assessing duty thereon at the rate of 13¾ per centum ad valorem. The protest is limited to such merchandise as is not subject to drawback allowances.

Paragraph 353, as modified, *supra*, provides as follows:

> Articles having as an essential feature an electrical element or device, * * * and not specially provided for:
>
>     *     *     *     *     *     *     *
>
>     Other * * *_____ 13¾% ad val.

Plaintiff herein claims said components are designed for, dedicated to, exclusively used for, and are essential to the operation of the F-104 export model military aircraft. As such, counsel for plaintiff contends duty should have been assessed under the following provision of paragraph 370 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, at the rate of 12½ per centum ad valorem:

> Airplanes and hydroplanes, and parts of the foregoing_____ 12½% ad val.

In an effort to establish that the imported components are parts of airplanes, plaintiff introduced the testimony of two witnesses and a booklet, which was received in evidence as plaintiff's exhibit 1.

The first witness called on behalf of plaintiff was Mr. Paul A. Lyons, project engineer in charge of the development of air data computers for Airesearch Manufacturing Co., the actual importing company herein. Mr. Lyons testified that he was familiar with the imported merchandise which consists of amplifiers and chassis for the F-104 air data computer; that other components of the computer are sensors, computing modules, potentiometers, motors, synchros,

transformers, resistors, and electrical and mechanical parts; that the purpose of the computer is to supply information to other systems of the F–104 aircraft; that the other systems are the navigation computers, the automatic pilot, bombing computer, landing gear warning system, and other major subsystems of the aircraft; that the F–104 is described as a fighter; that his company also makes air data computers for the F–4B, F–4C, A–3J, and an air speed computer for the P–3V; that the A–3J is an attack bomber, while the P–3V is a submarine hunting airplane; that, while the computers for the other aircrafts perform similar functions, they are all quite different in size, shape, and weight; that each is made specifically for a particular airplane.

Mr. Lyons testified that the computer for the F–104 operates from probes which are located outside the airplane and supplies information into the computer in terms of outside pressure, outside temperature, and the attitude of the airplane; that these basic quantities are then used to compute the seven flight parameters; that these seven flight parameters are the output used to feed all the other systems of the airplane by providing electrical signals, such as to the automatic pilot, whereby the aircraft can be flown properly as intended in the mission; that it supplies information to the landing gear warning system to permit the landing gear to go down when it is supposed to; that the computer is necessary for the performance of these functions; that the amplifiers and chassis assemblies are essential to the operation of the computer as are all parts essential to its operation; that he was in charge of the design of the computer, the specifications of which were written by Lockheed, the manufacturer of the aircraft; that the aircraft is specifically designed to accommodate the computer, which, in turn, is specifically designed to become part of the aircraft; that, while Lockheed manufactures the F–104 in the United States, a number of other companies throughout the world manufacture the aircraft under license from Lockheed; that his company or its licensees make the computer for all of these planes; that this computer is designed to be used only with the F–104 airplane; and that the airplane will not perform its intended functions without the air data computer.

On cross-examination, Mr. Lyons testified that the air data computer system made by his company for the F–104 supplies outputs to the following subsystems that are outlined on page 5 of plaintiff's exhibit 1: (1) position and homing indicator, (2) in range computer, (3) fire control computer, (4) automatic pilot, (5) inertial navigator, (6) bombing computer, and (7) landing gear warning. The witness testified that, with respect to the landing gear warning system, the computer supplies a signal which is indicative of a certain altitude and air speed or impact pressure, which signal is used to warn the

pilot to raise or lower the landing gear; that an airplane can be flown without an automatic pilot, but in a supersonic aircraft you require an automatic pilot; that, while an aircraft may be flown without an automatic pilot, it could not perform its intended mission; that he is familiar with the various versions of the F–104 aircraft, including the original United States Air Force version. However, he is more familiar with the export version. The original F–104 procured by the United States Air Force did not have a central air data computer nor an automatic pilot; that these planes, while they did not have a central air data computer system, did have computers which are essential to the flying of a supersonic aircraft; that the original F–104 and the present F–104 are not comparable machines, having different weapons systems, etc. While the F–104 did not have a central air data computer system, it did have a prototype air data computer supplying the necessary information, and this information is necessary whether or not it is obtained from one, five, or six boxes; that, in flying a F–104 from one point to another, not on a military mission, the central air data computer system would be used by the pilot for his position and homing indicator and inertial navigating system; that the position and homing indicator tells him where he is and where he is going, and the inertial navigator supplies the same thing in one form or another.

The next witness called on behalf of the plaintiff was Donald P. Smith, system engineer for Lockheed Aircraft, whose duties consisted of making sure that systems specified for the aircraft were correct and compatible with the other systems in the aircraft and to make sure the systems meet the requirements. Mr. Smith testified that he is familiar with the computer involved herein and that said computer is the only system used in the export model of the F–104; that the central air data computer must be compatible with the other systems of the aircraft since in general the other systems of the aircraft are specified first, such as what type of electronic systems is required in the aircraft, based upon the missions they wish the aircraft to perform, and, on that basis, his company chooses the systems for the customer. After having chosen various systems, such as radar system, bombing system, rocket system, and navigation system, we then have to decide what these systems require; that a majority of the electronic systems do require some air data information; consequently, the air data computer is generally specified last as its requirements are generally last to be known; that the central air data computer is designed to go into a particular slot in the airplane, and it must be shaped to fit that compartment in connection with other equipment in the same electronic compartment; that the imported computer is not used on any other plane than the F–104 export model; that the original F–104 required some form of air data system, although it was not an integrated system, but separate small systems; that the F–104 export

model is a more sophisticated model than those previously produced; and that the electronic systems in the F–104 export models are completely different from the electronic systems in the previous F–104's. Consequently, the air data computer must be completely different.

Mr. Smith further testified that he is familiar with the specifications applicable to the F–104 export model aircraft and that computers are required by the overall specifications; that an F–104 could not be delivered to a customer without an air data computer and that the accepting party could not fly it without the air data computer; that the air data computers at bar are not usable in anything other than an aircraft; that the outputs listed on page 5 of exhibit 1 are the systems which the air data control system must be designed to fit and work together with, but there are other models which have different bombing computers which are not included on page 5 of plaintiff's exhibit 1; that, while on previous models the air data system was less sophisticated, it was still necessary to obtain the information to go to the bombing computer, to the landing gear warning system, to an in range computer, and other systems; that, in order to obtain this information, it had previously used separate sensors until it was realized that the company could not carry on installing separate systems all over the airplane and they were, therefore, put in one central computer; that the information supplied to the bombing computer enables the pilot to drop the bomb so that its ballistic projectory will have it hit the target; that the bombing computer would serve no function if the pilot was not on a bombing mission; that the in range computer tells the pilot when he is in range of his adversary and that, if he fires his guns or rockets, they will reach the other aircraft; that if a pilot was not firing bullets or rockets, the in range computer would not serve any function. The landing gear warning system supplies the pilot information, warning that his height is such and his speed is such, that he should put the undercarriage down; that the pilot could ignore this warning information if it is not his desire to land; that if a pilot were to fly from one point to another, not on a military mission, the central air data computer would supply him the basic safety of flight warning (the landing gear warning system) the dead reckoning computer with a true air speed input from which the dead reckoning computer reckons the miles to go to the destination; that it would also supply the inertial navigational information to these two basic navigational instruments; that the plane could be flown without either of these two navigational systems.

On redirect examination, Mr. Smith testified that he could not conceive of any instance when the F–104 export plane is flown without the central air data computer because the export model specifications demand that it be fitted with an air data computer; that these planes

were designed for bombing, shooting bullets and missiles accurately, and landing; that, while the central air data computer system supplies warning signals, light, and sound in the landing gear warning system, the other systems supply information of a nature of which the pilot is not conscious of; that the pilot is aware that the air data computer is working correctly by the actions of his radar set; that the computers are specifically made for aircraft and have no other possible use; that the F–104 cannot be operated at the speed for which it is intended without having some basic sensing system; that the F–104 requires a landing gear warning system before it can be flown safely; that an F–104 without a central air data computer system would not be "acceptance flown" because it is an incomplete airplane; that if the air data control system had a malfunction, the pilot could fly it and land it; that if an F–104 with a full complement of systems is sold, the air data computer is not optional, it is mandatory; that all export F–104's are sold as military aircraft and contain the imported air data computer.

Based upon the record as made, plaintiff contends it has established that the central air data computer is a part of an airplane. Defendant, on the other hand, takes the position that, while the computer is an aid to the pilot, it is not essential to the operation of the aircraft and, hence, is not a part thereof. It is also contended, on the part of the defendant, that, in the cases cited, *infra*, relative to holding various articles as parts of airplanes, the conclusions therein were dictated by the fact that they were mandatory requirements of some governmental agency. Since the computers are used in military aircraft and in export models at that, there is no mandatory requirement by any governmental agency.

The question of what constitutes "parts" under the tariff laws of the United States has been the subject of considerable litigation over the years. There have, in fact, been a number of cases on the subject of airplanes within the scope of these decisions. In the case of *J. E. Bernard & Company, Inc.* v. *United States*, 43 Cust. Ct. 443, Abstract 63624, the court had before it for determination the proper classification of certain metal airplane seats with safety belts, used to seat passengers of the tourist class. The seats were made in accordance to specifications of the Civil Aeronautics Administration, which also required the seat belts. The court, in concluding that the seats and seat belts involved were parts of airplanes, reviewed a number of cases involving the question of whether certain imported articles constituted parts of airplanes. *International Forwarding Co.* v. *United States*, 56 Treas. Dec. 806, Abstract 9653; *Command-Aire (Inc.)* v. *United States*, 58 Treas. Dec. 325, T.D. 44278; *R. W. Cramer & Co.* v. *United*

*States*, 60 Treas. Dec. 874, T.D. 45270; and *Crawford Airplane Co.* v. *United States*, 62 Treas. Dec. 948, Abstract 21821.

In the case of *International Forwarding Co.*, *supra*, the court had before it a compass which was "specially constructed and exclusively designed for use in an airplane, as required by the regulations of air commerce." The court therein held such compass to be part of an airplane.

The *Command-Aire* case, *supra*, involved a so-called phylax aero fire extinguisher which was constructed and designed and exclusively used in airplanes built by plaintiff. The court, in arriving at its conclusion that said fire extinguisher was part of an airplane, made the following observation:

\* \* \* that although the article does not affect the flying qualities of the plane, it is used to promote the safety of the operator and passengers of the plane; and that the regulations of the Department of Commerce require the installation of fire extinguishers in all airplanes.

The *R. W. Cramer* case, *supra*, involved tachometers exclusively used on airplanes to indicate to the pilot the number of revolutions made by the propeller and required under mandatory regulations by the Department of Commerce. The court therein held said tachometers to be parts of airplanes.

The life belts for attachment to parachutes, which were required to be fitted in every airplane, were held to be properly subject to classification as parts of airplanes in the *Crawford Airplane Co.* case, *supra*.

While it is true, as pointed out by the defendant, all of the articles involved in the cases quoted, *supra*, were required by some governmental agency, it is also, nevertheless, a fact that the airplane was able to fly without them. In the case at bar, it is equally true that the F–104 export model aircraft can fly without a central air data computer in the limited sense that it can be airborne and fly, although not for its intended mission. As indicated, *supra*, since the computer is installed on military aircraft, manufactured for export, it necessarily follows that governmental regulations of a civilian nature directed for passenger use would not be applicable. The mere fact that the original F–104's, as manufactured for the United States Air Force, did not have a central air data computer, although the record does establish they did have separate data computers, is not a determinative factor. Along this line is the case of *United States* v. *Antonio Pompeo*, 43 CCPA 9, C.A.D. 602.

In the *Pompeo* case, *supra*, the merchandise involved was certain superchargers designed for and used exclusively in Ford and Austin automobiles. In arriving at its conclusion that said superchargers are parts of automobiles, the appellate court stated as follows:

We are of the opinion that the Government has misconceived the real issue before us. The problem is not whether or not automobiles are customarily manufactured with superchargers, but rather what is the nature and function of the imported superchargers. At the time of importation these superchargers, as the undisputed evidence clearly shows, are dedicated irrevocably for use upon automobiles. Such being the fact, it is unrealistic to attempt to determine the nature of the superchargers apart from their undisputed ultimate use. * * *

The cases cited by appellee, in our opinion, clearly indicate that where an article at time of importation is dedicated to a specific use, the question of whether the article is a part must be determined from the nature of the article as it is applied to that use. * * *

In the instant case there seems to be no doubt but that the involved superchargers are "parts" of automobiles after they are installed upon the automobiles. Since the imported superchargers at time of importation are dedicated solely for use upon automobiles, as previously pointed out, and since when applied to that use they clearly meet the definition of "parts" established by the *Willoughby* case, we are of the opinion that they were correctly classified as parts for automobiles.

Accordingly, in the case at bar, the question is not whether the original F–104 used by the United States Air Force contained a central air data computer, but whether the computer is designed and dedicated for use in an airplane. The record amply establishes that said computers are not only designed and dedicated for use in an airplane but specifically for the F–104 export model airplane and that they are necessary for the safe operation of the aircraft and in order to permit the fulfillment of its military function. Hence, under the above test, the central air data computer falls within the purview of "parts" for tariff purposes.

In addition to the foregoing, the appellate court has affirmed the position taken in the *Pompeo* case, *supra*, in the case of *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849, wherein certain auxiliary heaters designed and dedicated for use in Volkswagens were held to be parts of automobiles. The court, in arriving at its conclusion, reviewed a number of cases involving parts, such as *Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T.D. 34249, involving music rolls for player pianos; *Durbrow & Hearne Mfg. Co.* v. *United States*, 9 Ct. Cust. Appls. 177, T.D. 38001, involving sewing-machine shuttles; *United States* v. *Bosch Magneto Co.*, 13 Ct. Cust. Appls. 569, T.D. 41434, involving lamps and horns for automobiles; *United States* v. *American Steel and Copper Plate Co.*, 14 Ct. Cust. Appls. 139, T.D. 41673, involving halftone screens for cameras; *Stoeger* v. *United States*, 15 Ct. Cust. Appls. 291, T.D. 42472, involving a 32-shot magazine drum for a pistol; *United States* v. *Willoughby Camera Stores, Inc.*, 21 CCPA 322, T.D. 46851, involving cameras and tripods; *United States* v. *Carl Zeiss, Inc.*, 24 CCPA 145, T.D. 48624, involving rangefinders for cameras; and *Trans*

*Atlantic Company* v. *United States*, 48 CCPA 30, C.A.D. 758, involving metal brackets for door closers.

After this review, the court made the following observation:

Here, as in *Pompeo*, the imported articles are dedicated to a sole specific use and "for no other use." Here, as in *Trans Atlantic Company*, the imported article serves a useful function. In *Trans Atlantic* the brackets mounted on the door frame were necessary to the efficient operation of the door closer. * * *

By the same token, in the case at bar, the record establishes that the central air data computer is "dedicated to a sole specific use and for no other use" and that said computer is necessary for the efficient operation of the F–104 export model aircraft.

Based upon the foregoing, we are of the opinion that said computers covered by this protest are parts of airplanes within the purview of paragraph 370 of the Tariff Act of 1930, as modified, *supra*, and, since the components involved herein are parts thereof, they are properly dutiable at the rate prescribed thereunder.

Judgment will be entered accordingly.