Judgment will issue in conformity with the views above expressed.

(C.D. 2948)

BORDER BROKERAGE COMPANY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 10, 1967)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.
*Barefoot Sanders*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Before OLIVER, WATSON, and RAO, Judges

RAO, Chief Judge: The merchandise involved in these cases, consolidated at the trial, was imported from Canada on various dates in 1964 and 1965. It was described on the invoices as "Elastomuffles" or "Silent Sailors" and consists of various sized mufflers used in connection with motorboat engines. The articles were assessed with duty at 17 per centum ad valorem under item 774.60 of the Tariff Schedules of the United States, as articles not specially provided for, of rubber or plastics. While several claims were made in the protests and the amended protests, the claim before the court is that the articles are properly dutiable at 12 per centum ad valorem under item 696.15 of said tariff schedules as parts of yachts or pleasure boats.

The pertinent items of the tariff schedules are as follows:

Articles not specially provided for, of rubber or plastics:

| | | |
|---|---|---|
| 774. 60 | Other------------------------------ | 17% ad val. |

Yachts or pleasure boats, regardless of length or tonnage, whether motor, sail, or steam propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yachts or boats are brought into the United States under their own power; and parts thereof:

Yachts or pleasure boats:

| | | |
|---|---|---|
| 696. 05 | Valued not over $15,000 each---- | 4% ad val. |
| 696. 10 | Valued over $15,000 each------- | 10% ad val. |
| 696. 15 | Parts------------------------- | 12% ad val. |

The following headnotes are also pertinent:

Schedule 6, part 6, subpart D:

1.   This subpart does not cover—
   (i)   yachts or pleasure boats provided for in items 696.05–.10 if in use or intended to be used in trade or commerce, or if brought into the United States by non-residents thereof for their own use in pleasure cruising; or
   (ii)   vessels which are not yachts or pleasure boats (see general headnote 5(e))

General Headnotes and Rules of Interpretation

\*      \*      \*      \*      \*      \*      \*

5.   Intangibles.   For the purposes of headnote 1—

\*      \*      \*      \*      \*      \*      \*

   (e)   vessels which are not "yachts or pleasure boats" within the purview of subpart D, part 6, of schedule 6,
are not articles subject to the provisions of these schedules.

\*      \*      \*      \*      \*      \*      \*

10.   *General Interpretative Rules.*   For the purpose of these schedules—

\*      \*      \*      \*      \*      \*      \*

   (ij)   a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

At the trial, plaintiff called Neil W. McLeod, manager and president of Apex Equipment, Inc., a firm engaged in the distribution and sale of various products in the marine industry, especially internal-combustion engines, winches, and other components of boats. It also repairs, fabricates, and reconditions marine equipment. Mr. McLeod is a graduate of General Motors Institute of Technology and has done postgraduate work in mechanical and electrical engineering

and in business administration and accounting. He was employed by General Motors for 10 years as junior engineer, senior project design engineer, and in administrative and service work. He served 3 years in the Navy in the Amphibious Command engaging in engineering and logistical problems. Subsequently, he worked with a firm in Seattle helping it to establish and train men for the service of diesel, marine, and industrial engines. He then established his own firm in Bellingham, Wash. He has been concerned with silencers and mufflers for marine application, has handled mufflers made by diverse manufacturers, and has designed and fabricated them himself.

Mr. McLeod stated he was familiar with the Elastomuffles or Silent Sailors involved herein and had prepared brochures describing them and giving specific information relative to the size, application, and price of the various models. He testified that such specifications are necessary in order to select the product required for a particular boat or engine. The brochure and mufflers designated as Mark O, Mark II, Mark IV, Mark VIII (Silent Sailors), and Mark X, were received in evidence as plaintiff's exhibits 1 through 6, respectively. The models come in different sizes to fit the various pipe sizes to which they are to be attached. The brochure indicates that the customer should select the proper muffler for his boat by noting the horsepower of his engine and the outside diameter of the exhaust line and then determine from the chart the model, inlet-outlet size, and bushings required.

Mr. McLeod had also prepared instruction sheets for the installation of the inboard and outboard types of mufflers to enable the user to install them properly. (Exhibits 7 and 8.) Exhibit 7 is an instruction sheet for inboard silencers, such as the Mark O, Mark IV, Mark II, and Mark X. Exhibit 8 is for transom mount or external mount silencers, designated Mark VIII. The appropriate instruction sheet is packed with each muffler sold.

These mufflers are composed of synthetic rubber or an elastomer material, nitrile neoprene, a du Pont designation. The physical properties of the material enable the mufflers to absorb kinetic energy which is the base source of sound and thus act as silencers. They are wet mufflers, that is, water is introduced in the exhaust system and flows through the muffler as a part of the system. There are also mufflers, not involved here, which are made of metal and are sold for use on boats.

The inboard type of Elastomuffle is inserted directly into the exhaust line through which the exhaust gas from the engine is conducted to the exhaust outlet of the boat. A section of the exhaust line is removed and the end sleeves of the Elastomuffle slip over the cut ends of the pipe. The outboard type fits over the exhaust outlet or aperture at

the back end or transom of the boat. The primary purpose of the muffler is to silence the noise that comes from the exhaust, but the external or transom mount silencers (Mark VIII) also remove exhaust gas fumes or prevent them from recirculating and reentering the hull of the boat. This is an important consideration as the exhaust fumes are carbon monoxide. In many cases, according to the witness, mufflers have been put on to alleviate this dangerous condition.

Boats will operate without mufflers, but if one has been installed in the exhaust line and is removed, there will be an open line in the hull through which exhaust gas will be discharged. This is dangerous to the occupants of the boat. If the outboard type of muffler (Mark VIII) were installed and removed, some repairs, at least plugging up of holes, would be required in order for the boat to remain afloat.

According to the witness, a great and increasing number of pleasure boats are sold with mufflers of one form or another and some outboard engines are now built with a silencing device in the motor. The engines in connection with which Elastomuffles are used are marine engines, which the witness said are conversions or modifications of vehicular or automotive engines.

Mr. McLeod testified that his firm imported 30,000 silencers from 1958 through 1965, and he estimated that it had $\frac{1}{6}$ of the market for this product. It sold about 4,000 mufflers during the last year, so that the market in the United States would be about 24,000 or 25,000. The company sells to boat manufacturers, individual boat owners, and custom boat builders. Boat manufacturers to whom it has sold extensively include Chris-Craft Corp., Owens Corp., and Pembrook Corp., which are national in scope, and Western Fairliner, which sells primarily on the west coast, but does business as far east as Detroit. The people with whom his firm has direct contact are residents of the United States. The witness said that, according to statistics, 94 percent of the boats built in the United States are consumed in that market, from which he concluded that a good share of the owners of the boats are residents. Some of the mufflers involved herein have been used on commercial vessels, but they are a small part of the market. He also testified, "Our particular selling relationship on these [silencers] extends throughout the Western Hemisphere, with the exception of Canada," and that all sales might not have been for pleasure boats or yachts. However, based on his observations and the nature of the type of muffler involved herein, he stated that the majority of sales were for pleasure boats, since most commercial vessels use the dry type of exhaust system, while the contrary is true of most pleasure craft, and the mufflers here are designed and intended for small pleasure craft which use a wet type of exhaust.

Plaintiff claims that the Elastomuffles involved herein are "parts" of motorboats, in the tariff sense, and that the motorboats of which

they are parts are pleasure boats owned by residents of the United States. Defendant does not discuss the first claim in its brief, but argues that the merchandise here is not dedicated to use on, or chief use on, yachts or pleasure boats, and certainly not on yachts or pleasure boats owned by residents of the United States.

In a recent case our court of appeals held that whether a given article constitutes a part of another depends upon the nature of the part and on its function and purpose in relation to the article to which it is attached or is designed to serve. *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849. The merchandise there consisted of auxiliary heaters for use in Volkswagen automobiles. The heater was optional equipment; the car could be operated without it. However, it aided in the safe and efficient operation of the Volkswagen by contributing to the comfort of the passengers in frigid temperatures and to their safety by assisting in the removal of ice from the windshield thus enhancing the vision of the driver. It was dedicated for use in Volkswagen automobiles and had no other use. Removal of it, once installed, made it necessary to seal up holes in the bottom of the car, the gasoline tank, the engine compartment, and the driver's compartment, and to remove certain ducts. The court held it was a part of an automobile within the purview of paragraph 369 (c), Tariff Act of 1930, as modified.

See also *United States* v. *Antonio Pompeo*, 43 CCPA 9, C.A.D. 602; *Trans Atlantic Company* v. *United States*, 48 CCPA 30, C.A.D. 758; *Motorola, Inc., et al.* v. *United States*, 54 Cust. Ct. 303, Abstract 69019.

The Elastomuffles here fall within the purview of those cases. They are optional equipment, but once installed, they contribute to the efficient operation of the boat and the comfort of the passengers, and, we might add, the comfort of those within earshot. They become an integral part of the boat without which it will not function properly. In some cases, at least, they reduce or eliminate noxious fumes which may be dangerous to the occupants. Each model and size can be used only with the particular type engine and size of exhaust pipe for which it was designed. If installed and then removed, certain repairs would be necessary in order for the boat to operate safely. Many states require the use of mufflers on exhausts of motorboat engines. See, for instance, New York Navigation Law, section 44. Cf. *United States* v. *Bosch Magneto Co.*, 13 Ct. Cust. Appls. 569, T.D. 41434; *Eric Wedemeyer* v. *United States*, 7 Cust. Ct. 141, C.D. 556; *Spiegel Bros. Corp.* v. *United States*, 9 Cust. Ct. 194, C.D. 692, where the existence of statutes requiring horns or lights on automobiles or bicycles was found to be a significant factor in determining that they were parts thereof.

We conclude that the mufflers here involved are parts of motorboats in the tariff sense.

A more difficult question arises as to whether they are parts covered by item 696.15 of the tariff schedules, as claimed by plaintiff.

A literal interpretation of the words "parts thereof" in the prefatory language would lead to the conclusion that the only parts covered were those for *imported* yachts or pleasure boats, since only *imported* yachts or pleasure boats are subject to duty. No such interpretation has been given to the term "parts" in tariff provisions. In fact, many cases involve articles used by American manufacturers in the production or completion of merchandise in this country. *United States* v. *Antonio Pompeo, supra; United States* v. *F. B. Vandegrift & Co., Inc.,* 44 CCPA 15, C.A.D. 628; *Railway Express Agency, Inc., a/c Airesearch Manufacturing Co.* v. *United States,* 55 Cust. Ct. 328, C.D. 2598, decision on rehearing 57 Cust. Ct. 304, C.D. 2797.

*Ratsey Lapthorn, Inc.* v. *United States,* 26 Cust. Ct. 84, C.D. 1304, involved paragraph 370 of the Tariff Act of 1930, which provided for "motor boats, and parts of the foregoing" and defined "motor boat" as including "a yacht or pleasure boat, * * * whether sail, steam, or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof." The merchandise consisted of various articles used by the plaintiff corporation in the making of sails for yachts, not used in trade or commerce, but for pleasure. The court held that the articles were used solely in conjunction with the sails of yachts and were integral, constituent parts thereof and essential to the completion of sailboats, without which they could not function. They were, therefore, held to be dutiable under paragraph 370, as parts of motorboats. In referring to the paragraph in the headnote, the court noted:

* * * The paragraph further provides that "The term 'motor boat,' when used in this Act, includes a yacht or pleasure boat," *with certain other qualifications unimportant here.* [Italics supplied.]

In our view, the "parts" covered by item 696.15 are not limited to parts for *imported* yachts or pleasure boats. Are they limited to "parts" of or for a yacht or pleasure boat owned by a resident or brought into the United States for sale or charter to a resident? A consideration of the legislative history of the provision for yachts and parts gives some clue to the reasons for the language employed. *United States* v. *William Herman Wepner,* 32 CCPA 30, C.A.D. 282; *The Newman Company* v. *United States,* 57 Cust. Ct. 117, C.D. 2739. Vessels are treated as *sui generis* and not subject to duty unless Congress has specifically so provided. *The Conquerer,* 166 U.S. 110; *United States* v. *Porto Rico Coal Co.,* 17 CCPA 288, T.D. 43716. Motorboats were made dutiable by paragraph 370 of the Tariff Act of 1922, and it was held that this evinced a change of policy as to

certain vessels and that a motor yacht was dutiable thereunder. *David B. Roberts* v. *United States*, 17 CCPA 215, T.D. 43653. Congress had also provided in revenue acts for a tax on the use of foreign-built yachts, pleasure boats, powerboats, sailing boats, and motorboats. This came into some conflict with a 1925 treaty with Germany and was repealed. (Sec. 431, Revenue Act of 1928, 45 Stat. 867.) Instead, the term "motor boat" in paragraph 370 of the Tariff Act of 1922 was defined:

The term "motor boat," when used in the Act of September 21, 1922, includes a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam, or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include a yacht or boat used or intended to be used in trade or commerce, nor a yacht or boat built, or for the building of which a contract was entered into, prior to December 1, 1927. [Sec. 708, Revenue Act of 1928, 45 Stat. 881.]

As pointed out recently in *The Newman Company* v. *United States*, *supra*:

\* \* \* The Congress sought to enlarge the previous paragraph 370 in two major respects: (a) make sail and steam yachts and pleasure boats dutiable the same as motor boats regardless of length or tonnage, and (b) to eliminate any loophole based on mode of arrival. But on the other hand, motor boats built or contracted for before December 1, 1927, and those used or intended to be used in trade or commerce were now exempted. A boat exempted under the first exemption would be duty free, the court held in *Wepner*, *supra*, not dutiable under any other tariff provision. Doubtless the same would be true of a motor, sail, or steam vessel covered by the second exemption, that is, used or intended to be used in trade or commerce. *Consolidated Water Power & Paper Company* v. *United States*, 23 Cust. Ct. 65, C.D. 1192.

All of this shows that vessels are treated differently from other articles and that Congress intended to levy duty on certain pleasure boats imported and owned or imported and sold or chartered to residents, but not on all other vessels, many of which were instrumentalities of commerce.

Parts, however, do not necessarily have the same status as vessels. *Canadian National Steamship Co., Ltd.* v. *United States*, 29 CCPA 123, C.A.D. 180; *Austin & Company* v. *United States*, 24 Cust. Ct. 399, Abstract 54139; *Wilmington Shipping Company* v. *United States*, 27 Cust. Ct. 335, Abstract 55946.

The *Canadian National Steamship Co.* case involved a propeller and shaft made especially for a particular vessel at the time it was constructed in England, and which were carried on board the vessel from

England to Canada, and there removed. Subsequently, the vessel was disabled and put into Charleston, S.C., for repairs. The propeller and shaft were sent from Halifax for installation in the vessel. The court held they were nondutiable, stating:

It is our view that the propeller and shaft in controversy, which could only be used upon this particular vessel, which were made especially for the vessel when it was constructed, and which were carried thereupon until necessity required their removal, are parts of the vessel. Indubitably, no one would have questioned the status of the merchandise if it had accompanied the vessel into the port of Charleston, S.C., and we think the circumstances under which it was removed from the vessel and subsequently placed thereon is not sufficient reason for holding it to be merchandise such as was held to be dutiable in the cases relied upon by the Government, * * *.

Where the above cases, relied upon by the Government seem to be chiefly distinguishable is the fact that a line has been drawn between merchandise for the repair of a ship, which merchandise was not made for the ship or as a part of the same, and articles which are parts of the vessel. Unquestionably, repair merchandise that would be as suitable for one ship as for another could in no sense be regarded as a part of a particular vessel, and especially does this seem true under certain decisions, if it did not accompany the vessel.

*Austin & Company* v. *United States, supra,* involved a mast, boom, and sail of a sailboat, which sailboat had been previously imported, claimed to be integral parts of the boat. The boat had been assessed with duty under paragraph 370, Tariff Act of 1930, as modified. It was held that, since the parts did not accompany the boat, they were dutiable under paragraph 370, as originally enacted, the modification not including "parts."

While it would be relatively easy to determine at the time of importation whether imported yachts or pleasure boats were owned by residents or brought in for sale or charter to residents, it would be difficult, if not impossible, to determine this as to parts, many of which are used by boat builders who sell the completed boats to whatever customers they can find. No reason being evident for applying the restriction to parts, as there is to the boats themselves, we are of opinion that Congress did not so intend.

The wording of headnote (i) to schedule 6, part 6, subpart D, and that of General Headnote 5(e), *supra,* indicates that the yachts or pleasure boats of the type provided for in items 696.05–696.10 are exempt if in use or intended to be used in trade or commerce, or if brought into the United States by nonresidents for their own use in pleasure cruising. In the *Newman* case, somewhat similar language in paragraph 370 of the Tariff Act of 1930 was construed as follows:

The words "*used or intended to be used* in trade or commerce" require construction. This is not the ordinary use classification termi-

nology and the familiar customs "chief use" jurisprudence is inapplicable. "Used" would seem to mean the vessel is actually in use when it arrives in United States waters, as a vehicle of trade or commerce. "Intended to be used" then would mean the owner's actual intentions, and it might also mean dedicated to trade or commercial use in its design characteristics, if no actual intention appeared. Considerations of the chief use of the class or kind prevailing over the actual use of the very merchandise to be classified would seem wholly inapposite here. [Italics quoted.]

It is evident that the headnotes referred to and the quoted passage from the *Newman* case concern yachts or pleasure boats themselves. They are exempt if in actual use in trade or commerce or actually intended for such use, or brought in by a nonresident for actual use in pleasure cruising. In order to claim the exemption, actual use or intention to use, or design characteristics showing such use, would have to be established.

The provision for "parts," however, must be construed in the light of General Interpretative Rule (ij), *supra*, that "a provision for 'parts' of an article covers a product solely or *chiefly* used as a part of such article, * * *." [Italics supplied.]

In the situation here, as in the case of the residency qualification, it would be difficult, if not impossible, to determine whether all imported Elastomuffles were actually used or intended to be used in yachts or pleasure boats not used or intended to be used in trade or commerce. Chief use in such craft is not only the logical solution to the problem but is in accordance with the aforementioned interpretative rule.

The evidence in the instant case indicates that these Elastomuffles are chiefly used on yachts or pleasure boats and that they are not ordinarily used on commercial vessels. They are sold to individual boat owners and boat builders who make pleasure craft. They are designed for engines of relatively low horsepower. They are packed with simple instruction sheets, so that individual boat owners can install them themselves. According to the uncontradicted testimony, they are designed and intended for small pleasure craft which use a wet type of exhaust, whereas commercial vessels ordinarily use the dry type of exhaust. Thus, by their design characteristics, they appear to be dedicated to use on yachts or pleasure boats.

For the reasons stated, the mufflers involved herein are held properly dutiable at 12 per centum ad valorem under item 696.15, Tariff Schedules of the United States, as parts of yachts or pleasure boats. To that extent the protests are sustained. As to all other claims, they are overruled. Judgment will be entered accordingly.