(C.D. 3177)

Inter Maritime Fwdg. Co., Inc. *v.* United States

United States Customs Court, Second Division

(Decided October 30, 1967)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Bernard J. Babb, Harold L. Grossman*, and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before Rao, Ford, and Beckworth, Judges; Ford, J., dissenting

Rao, Chief Judge: The court is here called upon to determine the proper classification for customs duty purposes of certain insecticide hand dusters imported from France. The articles, composed in chief value of plastic, were classified by the customs officials as articles or wares, not specially provided for, composed wholly or in chief value of steel, in paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and subjected to duty at the rate of 19 per centum ad valorem by virtue of the similitude provision of paragraph 1559 of said traiff act, as amended by the Customs Simplification Act of 1954, 89 Treas. Dec. 242, T.D. 53599.

Plaintiff relies on the claim in its protest to the effect that the insecticide hand dusters are agricultural implements and as such are entitled to entry free of duty within the provisions of paragraph 1604 of the tariff act. Other claims in the protest were not urged at the time of hearing or in the brief of plaintiff. Therefore, said claims, being deemed abandoned, will be dismissed.

The statutory provisions involved herein are quoted below:

Paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

    &ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Carriages, drays, * * *.

    &ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Other, composed wholly or in chief value of iron, steel * * *_____ 19% ad val.

Paragraph 1559 of said act, as amended by the Customs Simplification Act of 1954, *supra:*

PAR. 1559. (a) Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Paragraph 1604 of the Tariff Act of 1930, *supra:*

PAR. 1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, * * * and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

Five witnesses were called to testify on behalf of plaintiff. The first of them was Pierre J. R. Baptiste, the actual importer of the merchandise in controversy. From his testimony, it appears he had an ex-

clusive import arrangement with the foreign manufacturer of the insecticide hand dusters in issue, a representative sample of which was received in evidence as plaintiff's exhibit 1. At the time of the instant importations, exhibit 1 was the only kind of insecticide hand duster he imported. Baptiste entered into a 1-year exclusive contract with the Ralston Purina Company of St. Louis, Missouri, whereby the latter company would be the sole distributor in the United States of insecticide dusters like exhibit 1. Baptiste stated he sold approximately 77,000 of the dusters to the Ralston Purina Company.

Also appearing as witnesses for the plaintiff were three employees of the Ralston Purina Company. Charles Willis Darby, an employee of the company since 1945, identified himself as manager of the veterinary department. Originally he had been employed in the disease control laboratories and subsequently took over the management of the sanitation research division of the company. He has a degree of doctor of veterinary medicine from Michigan State University, and also holds a bachelor of arts degree and a master's degree in bacteriology. He stated he had specialized in poultry diseases and in industrial research.

Eugene F. Sommer stated that he is assistant sales manager of sanitation products for the Ralston Purina Company and that, for 12 years prior to said assignment, he was the western region sales manager directing the activities of salesmen, dealers, and employees in the sale of sanitation products.

James H. Lee testified to being assistant manager of the special industry sales department of the Ralston Purina Company and that prior thereto, for 11 or 12 years, had been product sales manager and merchandising manager for the eastern region which, at the time of the instant importations, included New England, New York, Pennsylvania, Ohio, Virginia, and West Virginia.

Through the testimony of the three employees of the Ralston company, the following facts were developed. The Ralston Purina Company of St. Louis is the largest animal and poultry feed company in the United States. It is also a large distributor of sanitation and health aids for livestock and poultry. Included in the sanitation and health aids lines are four major groups of products: (1) disinfectants and cleaners, (2) insecticide products, (3) vermifuges or wormers, and (4) treatment products.

A need existed for a suitable dispenser of the company's insecticide products. When the insecticide hand duster represented by plaintiff's exhibit 1 was presented for consideration, it was the subject of research and test, and, being found to be practical, its use was recommended to their company by Darby, Sommer, and Lee. Upon their recommendation, it was added to the Ralston line of products and became known as the "Purina G–4 Insecticide Duster."

The insecticide hand duster at bar was described as a practical instrument in that it has no mechanical parts to become inoperative and that there is nothing to go out of adjustment. In explanation of how exhibit 1 operates, it was stated the top of the duster is unscrewed, insecticide powder is placed in the duster, the top is replaced, and the duster grasped by the handle and shaken with one hand or the bellows compressed with both hands to provide a wider distribution of the insecticide. A printed instruction sheet setting forth the manner of operation and proposed use of the articles at bar, which is enclosed with each duster at time of distribution, was received in evidence as plaintiff's illustrative exhibit 7.

As illustrative of the various Ralston products with which the use of the Purina G-4 Insecticide Duster is recommended, there were received in evidence one product container and four product labels as follows:

Illustrative exhibit 2—Container for Purina CRD Dust (dihydro-streptomycin sulfate) (for use in the prevention or treatment of chronic respiratory disease in chickens).

The labels are—

Illustrative exhibit 3—Purina Lice and Grub Killer (kills lice, cattle grubs, sheep ticks on dairy or beef cattle–sheep–goats).

Illustrative exhibit 4—Purina Poultry Dusting Powder (for control of lice and mites on chickens, pheasants, partridges, etc.).

Illustrative exhibit 5—Purina Dairy Cattle Dust (for horn fly control).

Illustrative exhibit 6—Purina Hog & Cattle Dusting Powder (insecticide and bedding deodorant).

The insecticide hand dusters are sold either as separate items or as part of combination or tie-in sales with the poultry, cattle, and hog dusting powders specified in exhibits 2 through 6.

The representatives of the Ralston company had sold said dusters solely for use in the agricultural trade by farmers, livestock men, and ranchers. The territory covered by Witness Sommer extended from west of the Mississippi to the Pacific Ocean, and that of Witness Lee was the eastern region which at the time of the instant importations included New England, New York, Pennsylvania, Ohio, Virginia, and West Virginia. Said witnesses had spent most of their time in the field teaching salesmen how to sell, accompanying them on their visits to farms and ranches, and demonstrating the use of the hand dusters for the administration of Ralston insecticides on hogs, dairy cattle, beef cattle, and poultry, and for use in the cages of laying chickens and in the bedding of livestock, which were the sole uses for the hand dusters.

In addition to having demonstrated the use of the dusters to farmers and ranchmen, as well as to dealers, in their sales areas, and to having

seen the dusters on farms and ranches in dairy barns, hog barns, tool rooms and feed rooms, where insecticides were kept, said witnesses had seen the dusters used by farmers and ranchers in many of the states in their regions.

Witness Sommer, in explanation of why he had not greater experience in seeing the article used, stated his job is primarily sales manager, teaching salesmen how to sell by demonstration, and that he does not subsequently go back to see if the article is used in accordance with the demonstration. He added that there had been very few complaints about exhibit 1, and he was sure, if the article did not work out as recommended, he would have received complaints from salesmen and dealers.

Also appearing as a witness on behalf of plaintiff was Thomas Clay Herrington, manager of the Pioneer Poultry Supply Company and also manager of the Jus-Lay Egg Production Corporation. The business of the Pioneer Poultry Supply Company is the sale of feed and supplies for livestock and poultry, whereas the business of the Jus-Lay Production Corporation is the production of eggs and the raising of started pullets for commercial egg flocks. Herrington had been with the Pioneer Poultry Supply Company in connection with selling, delivery, and assistant management since 1934, and has been in a managerial capacity since 1946. As to the Jus-Lay Egg Production Corporation, he oversees the management program and helps with the sales department, services which he has been performing since the company came into existence in 1960.

Upon being shown plaintiff's exhibit 1, he testified to his familiarity with the article and stated that it is sold by the Pioneer Poultry Supply Company and that it is used in the operation of the Jus-Lay corporation. The insecticide hand duster is sold by the Pioneer company in East St. Louis, Illinois, and throughout the surrounding farm area to farmers and poultry raisers. He has been to their places of business and has seen articles like exhibit 1 being used on the farms. It is most commonly used in the hog lot, not only to dust the hogs but also their bedding, and in poultry houses for dusting up under the birds when there is a mite or louse problem. He has seen exhibit 1 being used for the latter purpose both at the Jus-Lay farm and in other poultry farms and, on occasion, has personally used articles like exhibit 1 and has supervised others in such use.

On the record thus presented, the question to be determined is whether the insecticide hand dusters at bar are agricultural implements and, therefore, within the purview of paragraph 1604 of the Tariff Act of 1930 as contended by the plaintiff or, by virtue of the similitude provisions of the tariff act, are articles or wares, not specially

provided for, composed in chief value of steel, in paragraph 397 of said act, as modified, as classified by the customs authorities.

As to prior judicial construction given to the terms "agriculture" and "agricultural implements," reference is made to the case of *Tower & Sons* v. *United States*, 9 Ct. Cust. Appls. 307, T.D. 38239, wherein the court took occasion to say—

That the raising, feeding, and *caring for animals* such as sheep and cattle fall within the term "agriculture," can not be doubted. * * * [Italics supplied.]

And in *United States* v. *S. S. Perry*, 25 CCPA 282, T.D. 49395, the appellate court sustained the judgment of the court below in holding that celluloid poultry legbands used to identify poultry were within the provision for agricultural implements in paragraph 1604 of the Tariff Act of 1930.

In the course of its opinion, the court stated—

* * * An examination of the pertinent authorities, however, discloses that the courts have always given agricultural free list provisions like the one at bar, and many other tariff enactments which were intended to benefit agriculture, a very broad and liberal construction so that the evident purpose of Congress especially to favor agriculture might be carried out. *United States* v. *American Express Co.*, 12 Ct. Cust. Appls. 483, T.D. 40693. * * *

The court in that opinion further expressed itself to the effect that the raising of poultry was an agricultural pursuit in the same sense as the raising of livestock would be.

In the subsequent case of *Inter-Maritime Forwarding Co., Inc.* v. *United States*, 45 CCPA 125, C.A.D. 685, the *Perry* case, *supra*, was followed in holding that certain "Chixexers," devices for making internal optical inspections through the vent of cloaca of chicks to ascertain their sex, were held to be agricultural implements within the tariff provision therefor.

Inasmuch as the record before the court discloses that the instant insecticide dusters are utilitarian devices used for the care of cattle, hogs, and poultry by dairymen, cattlemen, swine raisers, and poultry-men, we are of the opinion that the articles in controversy would come within the provision for agricultural implements in said paragraph 1604 of the tariff act, provided all other elements of proof are present.

The provision for "agricultural implements" in paragraph 1604 of the Tariff Act of 1930 is what is termed in customs law a "use" provision which can only be satisfied by evidence of "chief use" of such an article. And what constitutes "chief use" has been the subject of much litigation in this and the appellate court. It was stated in the

case of *United States* v. *F. W. Woolworth Co.*, 23 CCPA 98, 100, T.D. 47765—

We are not unmindful of the rule that in order to establish "chief use" the evidence of use must relate to the United States generally, and not to a limited portion thereof. It may be proper to observe, however, that the question of whether "chief use" has been properly established depends upon the issues and the evidence in each case.

In the case of *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, 47 CCPA 1, C.A.D. 719, holding that certain so-called after-dinner coffee cups and saucers were not within the provision for tableware in paragraph 212 of the Tariff Act of 1930, as modified, the court stated—

Merely because one *can* drink from the imported cups and saucers does not establish the chief use thereof. A fugitive use or a mere susceptibility or capability of use is not controlling as to such chief use. *United States* v. *Butler Bros., supra; Richardson Co.* v. *United States*, 8 Ct. Cust. Appls. 179, T.D. 37289; *United States* v. *James P. Heffernan Paper Co.*, 17 CCPA 61, T.D. 43358, and cases there cited. It would have been more important to introduce evidence to prove that the eating and drinking habits of the people of this country had changed to such an extent so as to require a vast increase in the supply of these small cups and saucers in order to satisfy the demand of the increased number of people now drinking coffee from demi tasse cups. Without such evidence, this court must give credence to the substantial testimony in the record which attributes this increase to the fad of using this merchandise chiefly for display purposes.

The witnesses for appellee, importers, and merchants who dealt with the variety of ornately decorated, multi-patterned cups and saucers here in issue, testified that those who purchased from them did so chiefly for decorative purposes. *Since such witnesses have every incentive to know the particular uses to which their wares are appropriated, we are of the opinion that their testimony as to chief use has great probative value. Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T.D. 31120; *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T.D. 40668. [Italic supplied.]

A recent expression contained in the concurring opinion of Judge Nichols in the case of *Fred Bronner Corp.* v. *United States*, 57 Cust. Ct. 428, C.D. 2832, is of particular interest—

I wish to dissociate myself from the court's observation that plaintiff's evidence fails to establish the chief use of the imported merchandise as adult hobby items because of the infrequent instances of observation of actual use in the testimony.

It is my view that persons concerned in an executive capacity with specifying, ordering, importing, promoting, and selling merchandise are presumed to know what its chief uses are and may give competent testimony on the subject. Instances of actual observation of use, on social occasions perhaps, are unimportant compared to what they have

learned in the course of business. *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (decided February 15, 1966). Acc.: *Cotton, Neill & Co. (Ltd.)* v. *United States*, 11 Ct. Cust. Appls. 278, 280, T.D. 39084. * * *

In the circumstances of the present controversy, we are strongly inclined to the position taken by Judge Nichols in the above-cited case. Here too, there are "infrequent instances of observation of actual use in the testimony." However, this lack is more than compensated for by other compelling evidence by qualified witnesses. When, as here, the purpose of an insecticide hand duster is clearly indicated by the construction and nature of the article itself, by a printed instruction sheet in evidence which is generally distributed with the device, by the type of trade to which the hand duster is sold, by the fact that said trade reorders the item, and by evidence that such hand dusters were widely seen in farm sheds or barns where insecticide powders for the spraying of cattle, hogs, and poultry were stored, all factors which stand unrebutted in the evidence of record before the court in this case, it would appear that the only conclusion to be drawn from such evidence is that the insecticide hand dusters were actually used for agricultural purposes and no other. The court is of the opinion that persons serving in executive and sales managerial capacities, who recommend that a product be added to their company's line, and who promote, sell, train others to sell, and demonstrate the use of the article, are in a position to give competent evidence on the chief use of said article.

After due consideration of the testimonial and physical evidence, a review of the cases referred to by the parties in their briefs, and a consideration of judicial precedent, we are of the opinion that the insecticide hand dusters in issue should properly have been classified as agricultural implements in paragraph 1604 of the Tariff Act of 1930 and given the benefit of entry free of duty. That claim in the protest is, therefore, sustained. All other claims in the protest, being deemed abandoned, are dismissed.

Judgment will issue accordingly.

DISSENTING OPINION

FORD, Judge: Agricultural implements, while designated *eo nomine* in paragraph 1604, Tariff Act of 1930, have been held to embrace only such articles designed for use in agriculture. Accordingly, it is a use provision. In the field of customs jurisprudence, a use provision requires evidence of chief use of the class or kind of article and not the use to which the imported articles were put. *United States* v. *Colibri Lighters (U.S.A.) Inc.*, 47 CCPA 106, C.A.D. 739.

Chief use is a question of fact which must be established on the basis of positive testimony representative of an adequate geographical cross section of the nation. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544.

In the case at bar, the evidence of use is fragmentary and does not, in my opinion, establish, by positive testimony, actual use by the farmer throughout an adequate geographical area of the nation. The evidence adduced as to actual use by the farmer is limited to the East St. Louis area, and one farm in Pennsylvania, and one in Maryland. This is by far an inadequate showing of chief use throughout the United States. The evidence of use elsewhere represents demonstrations by sales personnel of the Ralston Purina Company and not actual use by the farmer. In order to cover areas of the United States where actual use of the imported article was not observed, which in this case amounts to the balance of the United States, the importer introduced the testimony of sales personnel who instructed in the use of the imported articles. Notwithstanding that executives and sales personnel are, because of their positions, deemed to be aware of the ultimate use of the articles they sell, their testimony is not, in and of itself, sufficient to establish chief use in a case such as this. This is particularly so where plaintiff's own witness "assumed," on cross-examination, that the imported dusters may be used on dogs. If the imported articles may be used on dogs, it is fair to assume that the dusters may be utilized on other nonfarm animals whose habitat is generally regarded as urban. Neither does the instruction by such personnel, as to the operation of the imported articles, constitute sufficient probative value to establish chief use by the ultimate consumer. Nor does the information contained in plaintiff's exhibits 2 through 7 have sufficient probative value to establish chief use. To utilize the latter information to establish chief use would create the illogical situation whereby a dealer of a given kind of merchandise would be in a position to control tariff classification by the selection of language he utilizes in a pamphlet or instruction booklet. *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 CCPA 146, T.D. 48009 (wherein a question of commercial designation was involved but the foregoing is deemed applicable to the principle of chief use).

The court, although it may be tempted to consider its own judicial knowledge of the chief use of the merchandise under consideration, may not do so. *L. Tobert Co., Inc., American Shipping Co.* v. *United States, supra.*

I am of the opinion that the record as made is insufficient to establish chief use. The utilization of information contained on the exhibits which was prepared by the ultimate consignee plus the testimony of salesmen who instructed in the operation but did not observe actual

use, if held sufficient to establish chief use, would, in my opinion, eliminate the necessity of proof within the previously declared standards.

I would, therefore, overrule the protest.