(C.D. 3585)

AL NYMAN & SON, INC. v. UNITED STATES

United States Customs Court, Second Division

(Decided October 9, 1968)

*Brooks & Brooks* (*Michael T. Crimmins* of counsel) for the plaintiff.
*Edwin L. Weisl Jr.*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

Before Rao and Ford, Judges

Rao, Chief Judge: The merchandise involved in this case consists of pin curl clips imported from Japan and entered at the port of New York on November 29, 1962. It was assessed with duty at 19 per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as manufactures of metal, not specially provided for, in chief value of steel. It is claimed to be properly dutiable at 17 per centum ad valorem under paragraph 339 of said tariff act, as modified, as household utensils, not specially provided for, in chief value of base metal.

The pertinent provisions of said tariff act, as modified, are as follows:

Paragraph 397, Tariff Act of 1930, as modified by T. D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

   *      *      *      *      *      *      *

    Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

   *      *      *      *      *      *

        Not wholly or in chief value of tin or tin plate:

     *      *      *      *      *      *      *

            Other, composed wholly or in chief value of iron, steel, * * *_____ 19% ad val.

Paragraph 339, Tariff Act of 1930, as modified by T.D. 54108:

Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for, * * *:

   *      *      *      *      *      *      *

    Not plated with platinum, gold or silver, and not specially provided for, composed wholly or in chief value of—

   *      *      *      *      *      *      *

        Other base metal:

     *      *      *      *      *      *      *

        Other _____ 17% ad val.

At the trial plaintiff called Leo Goldstein, director and vice president in charge of sales of Vassar Corp., manufacturer and importer of hair care accessories, for whose account the merchandise was imported, and Phyllis Lipoff and Nancy Newfrock, both employees of plaintiff's attorneys. Defendant called Louis R. Platt, vice president of Gibbs & Company, a firm engaged in the wholesale beauty parlor supply and equipment business, and Elizabeth Jones and Mattie Marcella Fair, both employees in the Customs Section of the Department of Justice.

Two exhibits representative of the merchandise involved herein were received in evidence as exhibits 1 and 2. Exhibit 1, designated as item No. 800/8, was described by Mr. Goldstein as a double-pronged steel clip with a spring or tension action intended for the purpose of holding the hair or a curl. These items are packed eight to a card and are in a poly bag. According to the witness, the package was so designed for the purpose of making available to the consumer a package of clips that can be bought in a retail store. Exhibit 2 is representative of the item designated as No. 888 on the invoice. It consists of four cards of clips packed together in a poly bag.

It is clear from the evidence and the exhibits that the merchandise was designed to hold a curl or create a wave in a woman's hair or hold

a hair roller in place. Such clips are used in the home and in beauty parlors to set women's hair. They are not ornamental. Women who are members of the same household or who are visiting there will borrow such clips from each other. Plaintiff's female witnesses said they would not wear them outside the home or beauty shop and very seldom saw women wearing them on the streets or in stores. Defendant's female witnesses, on the other hand, said they wear them outside the home and had often seen women wearing them on the streets and in supermarkets. They also used them to pin kerchiefs. Mr. Goldstein had seen them used by women in homes in various parts of the country, but had seen them on the heads of women in public very infrequently.

Mr. Goldstein testified that he had been employed by Vassar Corp. for 7 years and that his duties include the supervision of 32 to 35 sales agents who sell Vassar's product line all over the country. He had also covered the territory with his sales representatives and had sold pin curl clips personally. He stated that Vassar sells pin curl clips packaged as in exhibits 1 and 2 at wholesale to supermarket chains, distributors who service supermarkets, drug chains, drug wholesalers who sell to drug stores, syndicates, variety stores, and discount chains, such as S. H. Kress, McCrory's, Safeway Stores, A & P Stores, Food Fair, Grand Union, Rexall Drug, W. T. Grant, Korvette's, Shoprite, First National Stores, National Tea, Loche Drug, and Walgreen. These customers have retail stores throughout the United States and most of their sales are made at the retail level. According to Mr. Goldstein, his firm usually makes its sales through the buying offices of the chains, most of which are located in New York City. In some cases this results in nationwide distribution through all the chain's stores and in other cases it encompasses only a particular area. In the latter case, his firm approaches a buying office in some other part of the country in order to seek distribution in the stores there.

Vassar also sells to beauty supply wholesalers, but for that section of the trade, the clips are packaged 100 to a box and are not on cards.

Mr. Goldstein testified that 85 percent of the total sales volume for Vassar's complete line was directed toward the class of trade that sells at retail and 15 percent was directed toward beauty jobbers. He could not give figures as to sales of pin curl clips versus total sales. He could not say where Vassar ranked in the total nationwide wholesale market for pin curl clips and testified that he was not qualified to state what the total retail market was. He did not know the wholesale dollar volume of Vassar in pin curl clips in channels leading to distribution at retail and in those leading to the beauty supply market. He did not know how many competitors there were in the sale of pin curl clips at wholesale in the United States. He did say the greatest

competition was in the trade which resells at retail since there were more outlets, the volume was greater, and there were more people selling to those outlets.

Mr. Platt testified that his firm, Gibbs & Company, was a wholesale beauty parlor supply house, having 17 branches in the United States, with sales agents covering 45 states. He said it was the biggest organization in the United States in the wholesale beauty jobbing industry. It handles pin curl clips such as exhibited on exhibit 1, and sells them through its salesmen to beauty shops all over the United States. They are sold in lots of 100 to a box. His firm normally brings in about 15 to 25 thousand boxes, 4, 5, or 6 times a year, and disposes of them in the same year. He estimated that his firm sold about $80,000 worth of clips a year to beauty shops and that that amounted to less than one percent of its total wholesale business. He said that there are a little over 100,000 beauty shops listed in the United States and that his firm sells to 15,000 of them.

Mr. Goldstein testified on direct examination that pin curl clips were designed primarily for use in the home when a woman does her own hair. On re-cross-examination he stated:

* * * I did not say that this pin curl clip was designed for home use. I said the carded item on which those pin curl clips appear on were designed expressly for retail sales for home use.

He said he found the uses the same wherever he went, that is

For the purpose of holding a curl or creating a wave or holding the hair roller in place in the hair. It's a fastening facility, sort of, that type. And that is the only use. If you want to use it for the purpose of making a curl alone because you have short hair, you can use the clip. If you have longer hair and wish to roll your hair over a roller, then in order to fasten the roller to your hair you use a pin curl clip.

Q. Based on your past knowledge, observation, and experience the chief use of these articles is where?—A. At home.

All of the testimony was related to the year 1962, as well as periods before and after that time.

On the record presented, plaintiff claims that pin curl clips are utensils; that they are nonornamental; that they are used collectively by females in the household; that they are used for the personal comfort and convenience of household members; that they are chiefly used in the household and were so used at the time of importation; and that they are therefore classifiable under paragraph 339, *supra*, as household utensils. Defendant contends that plaintiff has failed to sustain its burden of establishing that the merchandise is chiefly used in the home.

It is well settled that chief use is a question of actual fact which must be established on the basis of positive testimony representative

of an adequate geographical cross section of the country (*L. Tobert Co., Inc., et al.* v. *United States*, 41 CCPA 161, C.A.D. 544) and that while the testimony of a single witness may be sufficient, such witness must be well qualified and his testimony must be of a convincing character and not negatived or controverted by substantial testimony to the contrary. (*United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325; *United States* v. *S. S. Perry*, 25 CCPA 282, T.D. 49395). Furthermore, it is proper to consider not only the testimony, but the characteristics of the merchandise itself. *United States* v. *Colibri Lighters (U.S.A.) Inc.*, 47 CCPA 106, C.A.D. 739. Executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and have been held competent to testify about them. *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617; *Royal Cathay Trading Co. et al.* v. *United States*, 56 Cust. Ct. 371, 383, C.D. 2662; *Fred Bronner Corp.* v. *United States*, 57 Cust. Ct. 428, 438–439, C.D. 2832; *Inter Maritime Fwdg. Co., Inc.* v. *United States*, 59 Cust. Ct. 412, C.D. 3177 (appeal dismissed, May 6, 1968).

The evidence in the instant case indicates that the pin curl clips involved herein are used both at home and in beauty shops for setting women's hair. They are bought by women in retail stores packaged 8 to a card and are sold to beauty shops in boxes containing 100. Contrary to the hair straightening combs and the curling irons involved in *F. B. Vandegrift & Co., Inc.* v. *United States, supra*, there is nothing about these clips making them suitable for use only in the home. The testimony of Miss Lipoff and Miss Newfrock does not establish chief use of pin curl clips in the home, nor does it purport to do so. Plaintiff's case, therefore, rests on the testimony of Mr. Goldstein. As indicated by the quotations above, his testimony is not without ambiguity. His opinion that pin curl clips are chiefly used in the home was based primarily on his experience in selling or supervising the selling of Vassar's product line to various types of chain stores. He testified that 85 percent was sold to such chains and only 15 percent to beauty shop suppliers. However, he was unable to give any estimate as to the quantity sold by his firm or its value or the rank of his firm in the trade. Mr. Platt, on the other hand, testified that his company brought in 15,000 to 25,000 boxes of 100 clips, 4 to 6 times a year, and normally disposed of them within the year. He said his firm sold to one-sixth of the beauty shops in the United States. It is evident from this testimony that Gibbs & Company sold a substantial quantity of pin curl clips annually to beauty shops. While there was testimony that some beauty shops sold pin curl clips at retail or let customers wear them home, it is obvious that most of the clips sold to beauty shops are used there in setting hair. Just as obviously, most

of the clips sold in retail stores are used in the home for the same purpose. The record here gives us no basis upon which to make a finding that sales to, and therefore presumably use by, one class of customer were greater in quantity or value than the sales to, or use by, another class. Consequently, we cannot hold that these articles are chiefly used in the home as household utensils.

For the reasons stated, the protest is overruled and judgment will be entered for the defendant.