(C.D. 4662)

HANCOCK GROSS, INC. *v.* UNITED STATES

Court No. 71-11-01813

(Decided June 25, 1976)

*Tompkins & Davidson* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Rex E. Lee,* Assistant Attorney General (*John J. Mahon,* trial attorney), for the defendant.

NEWMAN, Judge: This action contests the customs classification by the district director at the port of Philadelphia of certain merchandise imported from Japan in 1970 and 1971. The items involved comprise various metal fittings for rubber or plastic hoses (plain couplings, clinching couplings, snap-on couplings, menders and adjustable clamps), and the base or holder for a sink strainer (sink strainer bases).

The hose couplings and menders were assessed with duty at the rate of 13 or 11 per centum ad valorem (depending upon the date of entry) under the provision in item 657.80, TSUS, as modified by T.D. 68-9, for articles of zinc not more specifically provided for elsewhere in the tariff schedules. The adjustable hose clamps and sink strainer bases

were assessed with duty at the rate of 13 per centum ad valorem under the provision in item 657.20, TSUS, as modified by T.D. 68–9, for articles of iron or steel not more specifically provided for elsewhere in the tariff schedules.

Plaintiff claims that the hose fittings are properly dutiable at the rate of 11.5 or 10 per centum ad valorem (depending upon the date of entry) under the provision for household articles of metal, and parts thereof, in item 653.95 or 654.20, TSUS, as modified by T.D. 68–9 (depending upon the component material of chief value). Plaintiff further claims that the sink strainer bases are properly dutiable at the rate of 11.5 per centum ad valorem under the provision in item 653.95, TSUS, as modified by T.D. 68–9, for sanitary wares and parts thereof.

STATUTES INVOLVED [1]

Classified under:

Schedule 6, part 3, subpart G:

> Subpart G headnote:
>
> > 1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.
> >
> > \*    \*    \*    \*    \*    \*    \*
> >
> > Articles of iron or steel, not coated or plated with precious metal:
> >
> > > \*    \*    \*    \*    \*    \*    \*
> > >
> > > Other articles:
> > >
> > > \*    \*    \*    \*    \*    \*    \*

| | | |
|---|---|---|
| 657. 20 | Other_____ | 13% ad val. |
| | \*    \*    \*    \*    \*    \*    \* | |
| 657. 80 | Articles of zinc, not coated or plated with precious metal_____ | 13% or 11% ad val. |

Claimed under:

Schedule 6, part 3, subpart F:

> Part 3 headnotes:
>
> > \*    \*    \*    \*    \*    \*    \*
> >
> > 2. The provisions in this part which specifically refer to kitchen or table ware, or to table, kitchen, or household utensils and articles, include articles of types which are used outdoors as well as those which are used indoors.
> >
> > \*    \*    \*    \*    \*    \*    \*

---

[1] The rate depends upon the date of entry under Presidential Proclamation 3822, T.D. 68–9.

Articles not specially provided for of a type used for household, table, or kitchen use; toilet and sanitary wares; all the foregoing and parts thereof, of metal:

*    *    *    *    *    *    *

Articles, wares, and parts, of base metal, not coated or plated with precious metal:
    Of iron or steel:
        Not enameled or glazed with vitreous glasses:

*    *    *    *    *    *    *

| | | |
|---|---|---|
| 653. 95 | Other_____ | 11.5% or 10% ad val. |

*    *    *    *    *    *    *

| | | |
|---|---|---|
| 654. 20 | Other_____ | 11. 5% or 10% ad val. |

## ISSUES INVOLVED

The parties stipulated "that the merchandise described as 0424X MxF Snap On Hose Couplings and 0426X M Snap On Hose Couplings, in Entry No. 134705 (Protest No. 1101–1–000518), which was assessed with duty at the rate of 11 per cent as valorem under item 657.80, TSUS, as articles not specially provided for of zinc, not coated or plated with precious metal, is properly dutiable at the rate of 10 per cent ad valorem under item 654.20, TSUS, as other household articles not specially provided for, of base metal, not coated or plated with precious metal" (R.6).

Hence, remaining in dispute for. determination is whether the plain couplings, clinching couplings, menders and adjustable clamps are household articles or parts thereof, of metal, and whether the sink strainer bases are sanitary wares or parts thereof, within the superior heading to items 653.95 and 654.20.

I have concluded that: (1) Plaintiff's claims respecting the snap-on hose couplings and sink strainer bases should be sustained; and (2) plaintiff's claims respecting the other merchandise in issue should be dismissed.

## THE RECORD

The record comprises the testimony of two witnesses and twenty-one exhibits (including representative samples of the merchandise) for plaintiff; three witnesses and eight exhibits for defendant.

Plaintiff called as its first witness Helen Colleluori, plaintiff's import manager in 1970 and 1971. In her capacity as import manager, Mrs. Colleluori ordered merchandise and inspected it upon arrival, but thereafter "it was turned over to the sales department" (R.15).

Thus, she had no duties relating to the sale or marketing of the merchandise. In addition to her full-time duties as plaintiff's import manager, Mrs. Colleluori "helped" her husband in their hardware store, where she worked evenings "after six o'clock" and on weekends (R.46).

Mrs. Colleluroi testified that in 1970 and 1971 she personally used all of the hose fittings in issue at home to mend her garden hose "so it could be used again without going to the cost of additional hose" (R.41); that in her hardware store she sold the articles to homeowners to repair garden and washing machine hoses; that the hose fittings are "basically a home item", and it was "very unusual for somebody in industry to come to [her] as a hardware woman" (R.43); that she saw all of the hose fittings used in the homes of friends whom she had visited in 1970 and 1971 in the states of California, Washington, Massachusetts, Connecticut, Virginia, Maryland, Ohio, Florida, New Jersey, New York as well as in the District of Columbia; that she saw the hose fittings used by people for washing cars and rinsing sidewalks; that the adjustable clamps are used to hold couplings, menders and aerators, and to attach massage and hair sprays to spigots; and that all the hose fittings, except the clinching couplings, are reusable.

Respecting the sink strainer bases, Mrs. Colleluori testified that those articles are used in a sink to prevent sediment from going down the drain, and she regarded the strainer bases as "sanitary wares".

On cross-examination, Mrs. Colleluori testified that while the plain couplings and the menders were "reusable", they were normally intended to remain inserted in the hose so long as the hose remained functional; that the 0137X and 0138X hose menders (exhibits 3 and 6) are listed in plaintiff's catalog (exhibit 12, page 225) under the "Industrial Hose and Fittings" section; that page 224 of the catalog, which is also in the "Industrial Hose and Fittings" section, lists zinc brass plated garden hose couplings in sizes $\frac{3}{8}''$, $\frac{1}{2}''$, $\frac{5}{8}''$ and $\frac{3}{4}''$; that the 0190 couplings listed in the "Industrial Hose and Fittings" section of plaintiff's catalog (page 224) is the same article as the 0190X $\frac{1}{2}''$ coupling represented by exhibit 7; that the 0189, 0191 and 0192 couplings listed on page 224 of plaintiff's catalog under the "Industrial Hose and Fittings" section are the same as the 8000XCD, 8002XCD and 8003XCD plain couplings respectively represented by collective exhibit 1; that the 0115 $\frac{1}{2}''$ male coupling shown on page 224 of plaintiff's catalog is the same coupling as the 8009XCD male $\frac{1}{2}''$ coupling represented by exhibit 9; that the 0116 $\frac{5}{8}''$ male coupling shown on page 224 of plaintiff's catalog is the same coupling as the 8010XCD $\frac{5}{8}''$ male coupling represented by exhibit 10; and that the

0117 ¾'' male coupling shown on page 224 of the catalog is the same coupling as the 8011XCD coupling included in exhibit 1.

Plaintiff called as its second witness Gertrude Cohn, who, with her husband, owned and operated a hardware store in Philadelphia from 1935 to 1972. The hardware store "handled most all household articles and sanitary supplies" (R. 69).

Mrs. Cohn testified that in her "various travels" in New York, Pennsylvania, Nevada, California, New Jersey and Florida she observed the use of the hose fittings; that the plain couplings and clinching couplings were used for the same purpose—repair hoses; that the couplings were household articles used on rubber or plastic garden or lawn hoses, on washing machine hoses, on the ends of "Y's" which connect hot and cold water spigots, and with shampoo sprays that screw onto a spigot; that she knew of no industrial uses for the couplings; and that the plain couplings were reusable—"you can take it off or put it back on any time you wish whenever it is necessary" (R. 76).

Respecting the hose menders, Mrs. Cohn testified that they were used with clamps to repair ⅜'' to ⅝'' plastic or rubber lawn hoses used around the home; that she knew of no other use for the menders and that the menders were reusable.

Relative to the adjustable clamps, Mrs. Cohn testified that they were installed on rubber or plastic garden hoses up to ⅝''; that she had "seen them on garden hose, household garden hoses, almost in any household in the country" (R.83); that the clamps were used: to hold repair couplings and menders on hoses; to hold "shower hoses" tightly to the spigots; to hold "drain fills" on hoses, as shown on page 132 of plaintiff's catalog; to hold snap-on couplings to faucets, as shown on page 134 of plaintiff's catalog; to hold faucet adapters, as shown on page 135 of plaintiff's catalog; on tailpieces which are small pieces of hose with an adapter on the end of them, for use on spigots, as shown on page 135 of plaintiff's catalog; and to hold air hose couplings, as shown on page 225 of plaintiff's catalog. Mrs. Cohn further asserted that the clamps are reusable—"[y]ou just unscrew them and take them off" (R.84); and that she would categorize the couplings, menders and clamps as "household articles" since "[t]hey are used in the household for household purposes only *as far as we were concerned in the store*" (R.80).

Additionally, Mrs. Cohn testified that she makes a distinction between "household articles" and "parts of household articles"; that the former "is something in itself, in its entirety" while the latter "are items that cannot be used in and of themselves [and] * * * have to be used with something else" (R.81–82); that she considered the couplings, menders and clamps to be "household articles"; and that

she "would consider anything that is used in the household as a household article" (R.84).

On cross-examination, Mrs. Cohn reluctantly admitted that the couplings and menders when attached to hoses were parts thereof for the life of the hose. The record shows the following (R.89–90):

Q. On the question of whether or not these articles are reusable or whether or not they are permanent, when you attach articles as represented by Plaintiff's Collective Exhibits 1, 7, 9, and 10, the plain hose and couplings, are they intended to remain with the hose?—A. They could remain, but they don't have to remain. They can come off, sir.

Q. Normally, would you take them off?—A. If the hose would break, I would take it off and use it again.

Q. During the life of the hose they would remain on the hose?— A. Yes.

Q. And, similarly, for the menders when inserted?—A. Yes. Once you insert them, you usually leave them there.

Q. There is no reason to take them out; they become part of the hose?—A. Unless the hose is gone and you want to fix——

Q. They would be part of the hose when attached?—A. Yes.

Mrs. Cohn also testified on cross-examination that she could tell that a mender was *inside* a hose by "looking" and by feeling the hose; that the clamps which appear on page 225 of plaintiff's catalog, which she testified were used on air hoses, are in the section of the catalog for "Industrial Hose and Fittings"; and that on that same page 225 also appears the 0137 and 0138 hose menders, which indicated to her that these menders were used in industrial applications, although she had never sold them for such purpose.

On further cross-examination, Government counsel questioned Mrs. Cohn concerning her distinction between "household articles" and "parts of household articles". After insisting that the fittings were used by themselves in the household (R.97), she subsequently conceded that the fittings would have to be joined to a hose to function, and could not be used by themselves (R.99).

On redirect examination, Mrs. Cohn testified that none of the articles before the court were used with hose ¾" or larger; that the articles were used with ⅜" to ⅝" hoses; and that she considered hoses ¾" or larger as "industrial" (R.101).

On recross-examination, Mrs. Cohn stated with reference to the ¾" hose couplings (8003 and 8011 in exhibit 1) that "to me they are industrial, I never handled them. I really don't know what they are used for" (R.101–102).

With reference to the sink strainer bases, Mrs. Cohn testified that these articles were used in sink basins to keep dirt and other things from going into the drain "which makes it sanitary" (R.72); and that

the base portion is used as a strainer and holds the flat strainer portion.

Defendant's first witness was Samuel Bailey, vice president since 1972 of H. J. Murray & Company, Incorporated of New York City, a wholesale industrial supplier and a specialty house in hose couplings. Murray represents companies which manufacture couplings used for industrial water, steam and air hoses, hose clamps, and menders. It appears that Murray sold in approximately twenty states to rubber hose distributors, contractors' supply and equipment houses, and industrial and mill supply houses. Prior thereto, from 1969 to 1972, Mr. Bailey was the sales manager for the Le-Hi Division of Parker-Hannifin, a manufacturer of industrial hose fittings, including those utilized for air, water and steam. The Le-Hi Division sold its products nationwide to about 15,000 accounts comprising manufacturers of air, steam, water and hydraulic hoses, hose distributors, mill supply houses, contractors' supply houses, plumbing and pipe supply houses, and original equipment manufacturers. At the time of the trial, Bailey had been actively engaged in the industrial hose coupling business for about 16 or 17 years.

Mr. Bailey testified that the zinc die cast brass plated water hose couplings represented by defendant's exhibit A, which were manufactured by Parker-Hannifin Corporation, were "similar in all material conditions" to the zinc die cast brass plated water hose couplings represented by plaintiff's exhibits 1, 7, 9 and 10 (R.114); that these couplings were sold in the years 1970 and 1971 throughout the United States by the Le-Hi Division of Parker-Hannifin, of which he was then product sales manager, through some 7,500 industrial accounts comprising hose distributors, hose manufacturers, contractors' supply houses, and mill and industrial suppliers for use on industrial water hose; that the couplings were not sold with clamps inasmuch as clamps were sold separately by the company; that the couplings were sold in three sizes—½", ⅝" and ¾"—and had garden hose thread; and that the Le-Hi Division did not utilize channels of distribution that catered to the retail homeowner type trade but only solicited industrial accounts.

Mr. Bailey further stated that the wrought brass clincher type water hose couplings represented by defendant's collective exhibit C were the same in design and function as, but different in composition from, the zinc die cast brass plated couplings in plaintiff's collective exhibit 2; that the couplings represented by exhibit C were sold in the years 1970 and 1971 in the industrial hose market in competition with the products of his employer, the Le-Hi Division of Parker-Hannifin; that in his opinion, and based upon his experience, the clinching type couplings represented by plaintiff's collective exhibit 2

were more appropriate for, and more in demand for use in, industrial applications than those represented by defendant's collective exhibit C, because the plaintiff's clinching couplings were "a heavier duty fitting", less likely to be crushed, and less expensive.

Additionally, Bailey testified that the Parker-Hannifin galvanized hose clamps, represented by defendant's collective exhibit F, are the same as those sold in 1970 and 1971 by that company when he was product sales manager, and that they are currently sold by H. J. Murray & Co., Inc.; that they were sold in 1970 and 1971 to the same industrial outlets, hose distributors, hose manufacturers, contractors' supply houses, and industrial supply houses as the couplings; that they were principally used on air and water hoses in industrial applications; that they are similar in size and design and are of the same gauge as the clamps represented by plaintiff's exhibits 4, 8 and 11, although the smallest and middle size were slightly heavier in weight than plaintiff's exhibits 8 and 4, respectively.

Finally, Bailey testified that the chief use of the couplings and clamps which he identified was to couple industrial air and water hoses.

On cross-examination, Mr. Bailey testified that he had observed couplings such as those in defendant's exhibits used in connection with lawn hoses at his home and on his neighbor's lawn.

Defendant's second witness was Joseph C. Gadd, Jr., president of the J. C. Gadd Company of Denver, Colorado. During the period of April 1970 to February 1971, Mr. Gadd was vice president of the J. C. Gadd Company.

In 1970 and 1971, the Gadd Company manufactured and sold zinc die cast brass plated garden hose couplings (represented by defendant's collective exhibit H) and zinc die cast hose menders (represented by defendant's collective exhibit I), which couplings and menders were the same in function, design, construction, material and sizes as plaintiff's zinc die cast brass plated garden hose couplings (represented by exhibits 1, 7, 9 and 10) and plaintiff's zinc die cast hose menders (represented by exhibits 3 and 6). The Gadd Company, however, did not manufacture or sell any clamps. During the period of 1970 through the first quarter of 1971, the Gadd Company sold its hose fittings to 31 customers in 13 states "from New York to California and from Minnesota to Florida" (R.161–162). Gadd's customers included hose manufacturers, hose distributors, equipment manufacturers and general industrial distributors. In essence, $97\frac{1}{2}\%$ of Gadd's sales were made to "industrial accounts" and $2\frac{1}{2}\%$ of sales were made to organizations of unknown types. No sales were made to homeowners, retailers or to jobbers that stock retailers.

Mr. Gadd stated that his couplings were used in water hose, washing machine hose, and low pressure air, gas and water applications; and the menders were used in low pressure water hoses and washing machine hoses.

Respecting the question whether the couplings and menders are parts of hoses, the witness testified as follows (R.167):

> Q. Mr. Gadd, when either the couplings or the menders are inserted in or are utilized in a hose, do you consider that [it] becomes a permanent part of the hose?—A. Yes. The coupling has no separate use from the hose.
>
> Q. It would remain in the hose?—A. It would not be functional until coupled to the hose and, once coupled to the hose, would be a permanent part of the hose.

On cross-examination, Mr. Gadd stated that his customers used the hose menders to join remnant hoses to form the desired lengths of garden or other hoses intended for low pressure applications; that both the couplings and menders were used in lawn hoses; that he did not sell his couplings and menders with clamps because "[c]lamps are readily available from other sources and we would have no unique advantage in offering the same for sale" (R.172); that his couplings and menders were not sold carded but only in bulk; that in his business the majority of "clamps" used with hoses are external ferrules of annealed brass which are crimped over the outside of the hose and are not reusable; and that the menders, plain couplings and clamps could be removed from a hose and reused on another hose.

On redirect examination, Mr. Gadd testified that while the couplings would take a pressure of up to 150 pounds, the normal pressure of a household lawn hose is 40 to 60 p.s.i.; that therefore the couplings were not limited to lawn or garden hoses; and also that when he used the term "lawn hose" he was referring to a water hose. With reference to chief use, Gadd stated (R.178):

> Q. And from your knowledge of your products and through whom they are sold, and to whom they are sold, what is your understanding of the chief use of your couplings and menders? What types of hose are they used in?—A. They are used in low pressure industrial hose.
>
> Q. That would be the chief use of the couplings and menders?—A. Yes.

On recross and re-redirect examination, Mr. Gadd testified that "unlike other witnesses," he did not inspect garden hoses when he went visiting in various states (R. 179), but that "[n]obody can quarrel with the fact that every state has people that use lawn hoses" (R. 182); that the couplings represented by exhibits 1, 7, 9 and 10 (plain

couplings) are the type that are *used* by homeowners in and around their homes; but that significantly the *chief use* of the couplings represented by defendant's exhibit H (which are identical in construction, material, design and function to plaintiff's exhibits 1, 7, 9 and 10) was in industrial hose.

Defendant's third and final witness was Theodore H. Johnson, plumbing and fittings product manager for American Standard. Mr. Johnson testified concerning the commercial meaning of "sanitary ware" as follows (R.190):

> A. Sanitary ware, in the plumbing industry and in American Standard, is identified as a receptacle or vessel to receive, hold, or discharge water or other fluids. It is in the plumbing industry primarily a material; vitreous china, or cast iron, or enameled cast iron, enameled stamped steel, stainless steel, or plastic or fiberglas, but it is a container, basically.
>
> Q. And how do you refer to those articles that you would sell that would meet the definition of sanitary ware?—A. Bath tubs, toilets, lavatories, sinks.
>
> Q. And what general term do you use to include all of those articles?—A. Fixtures. Those are fixtures.

Moreover, Johnson stated that a sink strainer base (exhibit 5) was known in the plumbing industry as a "fitting"; that he considered the strainer base to be "independent of the fixture" since fixtures or sanitary wares are not sold with fittings attached; that the function of the strainer base is to receive and direct the flow of the waste water from the fixture into the drainage and waste system of the building; and that he did not consider the strainer base to be part of sanitary ware or part of the sink to which it is attached.

Mr. Johnson added that the strainer base is inserted into the opening of a sink and connected with a locknut; that a wrench is required to install the strainer base into the sink, and there must be a tight joint.

On cross-examination, Johnson testified that exhibit 5 fits into the sink so as to make it watertight, and water will flow out only through the strainer base; that normally the strainer base remains attached to the sink for the life of the sink; that "it is necessary to have some kind of a drainage outlet to a sink to insure sanitation and cleanliness" (R.197); that a sink will not operate effectively without a device such as exhibit 5; and that exhibit 5 was used for sanitary purposes.

HOSE FITTINGS (COUPLINGS, MENDERS, AND CLAMPS)

The parties have stipulated that the "snap on" type couplings in entry No. 134705 are properly dutiable under item 654.20, TSUS, as modified, at the rate of 10 per centum ad valorem. Hence, the hose fittings in dispute are: (1) plain couplings; (2) clinching couplings;

(3) menders; and (4) adjustable clamps. Respecting these four categories of hose fittings the issues are: (1) whether they were chiefly used in the household, and (2) whether they are parts of rubber or plastic hoses.

## CHIEF USE ISSUE

The provision for household articles is a use provision. By statute, the use which governs is "the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined". General Interpretative Rule 10(e)(i). *See also United States v. Parksmith Corporation*, 62 CCPA 76, C.A.D. 1149, 514 F.2d 1052 (1975). Hence, pursuant to its claims under items 653.95 and 654.20, plaintiff had the burden of establishing that the chief use of the class or kind of hose fitting to which each category of merchandise belongs was as household articles. Plaintiff contends that the chief use of the hose fittings was in the repairing of lawn or garden hoses used in and around the household. Defendant, on the other hand, insists that the fittings were chiefly used in air and water hoses for industrial applications, where the fittings were used to couple or join sections or remnants of hose to desired lengths, rather than used to repair hoses used around homes.

From a review of the record, I have concluded that in 1970–71 hose fittings of the classes and kinds involved here were used in the United States for industrial water and air hoses as well as for household hoses, and that plaintiff failed to prove that household use predominated. *Cf. Kotake Co., Ltd., Standard Trading Co., Ltd.* v. *United States*, 67 Cust. Ct. 178, C.D. 4271 (1971); *Charles H. Demarest, Inc.* v. *United States*, 62 Cust. Ct. 583, C.D. 3829 (1969); *Voss Int. Corp.* v. *United States*, 61 Cust. Ct. 123, C.D. 3544, 287 F. Supp. 989 (1968); *Providence Import Co., Inc.* v. *United States*, 55 Cust. Ct. 243, C.D. 2584 (1965).

Although defendant's witnesses Bailey and Gadd conceded that the involved fittings were used on household garden hoses, they nevertheless testified that the chief use of the articles was in industrial air and water hose applications. It is now well settled that sales and marketing executives concerned with the promotion and merchandising of a product over a wide geographic area [2] may give testimony concerning the product's chief use. Thus, in *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, 111–112, C.D. 2617 (1966), the court aptly observed:

> The Government makes much of the fact that the witnesses Gayer and Howell ceased to go into people's homes to sell this

---

[2] Bailey's sales' experience was "nationwide", while Gadd's sales covered some thirteen states.

merchandise years before the dates of importation. This entirely misunderstands the probative weight of the testimony executives can give, who have been concerned in designing, framing specifications, ordering, importing, selling, distributing, and promoting the manufactured article whose chief use is to be determined. Gayer and Howell continued to deal in the involved straighteners and curlers. Such persons have to know the chief uses of what they sell and sporadic instances of their seeing it in use in people's homes (on social occasions perhaps) add but little. One gets rather tired of having such instances dragged in by the ears. * * *

Similarly, in *Inter Maritime Fwdg. Co., Inc.* v. *United States*, 59 Cust. Ct. 412, 419, C.D. 3177 (1967):

* * * Here, too, there are "infrequent instances of observation of actual use in the testimony." However, this lack is more than compensated for by other compelling evidence by qualified witnesses. * * * The court is of the opinion that persons serving in executive and sales managerial capacities, who recommend that a product be added to their company's line, and who promote, sell, train others to sell, and demonstrate the use of the articles, are in a position to give competent evidence on the chief use of said article.

*See also Al Nyman & Son, Inc.* v. *United States*, 61 Cust. Ct. 236, C.D. 3585 (1968).

In light of the views expressed by the court in the above-cited cases, I am clear that the testimony of defendant's witnesses Bailey and Gadd have substantial probative value respecting the issue of the chief use of the hose fittings.

Indeed, as an admission of the industrial applications for the hose fittings and as corroborative of the testimony of defendant's witnesses Bailey and Gadd, plaintiff's own sales catalog (exhibit 12) shows that the couplings, menders and clamps were advertised for use on industrial hose. In short, the record demonstrably shows that the hose fittings in issue were sold for industrial as well as household applications. Under these circumstances, it was incumbent upon plaintiff at the minimum to disclose the facts within its possession relating to its own marketing experience during the relevant period of time concerning which the record is silent. *Cf. Nyman, supra.* Instead of sales or marketing data, plaintiff adduced the testimony of its import manager (Mrs. Colleluori), an employee who did not claim to have any knowledge concerning plaintiff's sales, and whose principal qualification relative to the marketplace was that she worked in a hardware store evenings and on weekends. Mrs. Colleluori, ostensibly, was unaware of the industrial applications for the hose fittings despite the plain indication to the contrary in plaintiff's catalog, which she identified at the trial.

In sum, plaintiff's witnesses were aware of only household uses for the fittings, and offered no testimony which is helpful to the court in

determining their *chief* use. Defendant's witnesses (Bailey and Gadd), on the other hand, were aware of both the household and industrial uses for the fittings, and stated that their chief use was in industrial water and air hoses.

Plaintiff emphasizes that "many" of the plain hose couplings and menders were imported "carded", viz., packaged with clamps on a card. However, the testimony and exhibits demonstrate that the couplings and menders sold uncarded and without clamps are identical to the same items sold carded with clamps, the only difference being the stock number assigned to the article. Moreover, plaintiff's witnesses made no distinction in use between the carded couplings and menders and the same articles sold uncarded. Therefore, for purposes of determining chief use, each category of merchandise, i.e., plain couplings, menders and clamps, represents a "class" or "kind" of merchandise whether the articles were sold carded or uncarded.

Plaintiff also emphasizes that homeowners having a lawn use garden hoses. While, of course, it is indisputable that homeowners use garden hoses, this fact does not mean that the court may infer or take judicial notice of the chief use of the class or kind of hose fittings involved in the case. It is important to note that the issue is not the chief use of *garden hoses*, as implied by plaintiff's argument, but rather the chief use of the classes and kinds of *fittings* involved here. While it may be true that garden hoses are chiefly used by homeowners,[3] it does not necessarily follow that the classes or kinds of fittings involved here were chiefly used in household garden hoses. Since the record shows that the fittings were used in industrial air and water hoses, as well as by homeowners, and there is controversy between the parties respecting the chief use of the fittings, chief use in the household had to be established by evidence. And on this issue, plaintiff had the burden of proof. As the appellate court observed in *L. Tobert Co., Inc.* v. *United States,* 41 CCPA 161, 164, C.A.D. 544 (1953):

> While judicial notice may be taken of well known uses of an article, chief use is a question of actual fact which, in a case of this character, should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation. * * *

*See also Tanross Supply Co., Inc.* v. *United States,* 58 CCPA 26, 35, C.A.D. 1000, 433 F. 2d 1332 (1970).

Finally, I have carefully considered and find totally without merit plaintiff's unfounded contentions respecting "surprise"; defendant's

[3] It is, of course, also true that garden hoses are commonly used by motels, restaurants, country clubs beaches, camps, parks, schools, garages, golf courses, cemeteries, and by most commercial buildings having water connections threaded for a garden hose. Plainly, garden or lawn hoses are not inherently household articles.

alleged concealment of evidence; the failure to furnish plaintiff the names of witnesses to be called at the trial; and plaintiff's alleged lack of opportunity for discovery relative to the issue of chief use.

## Parts Issue

Defendant argues that the hose fittings are not classifiable as household articles of metal, or parts thereof, because the fittings are parts of rubber or plastic hoses. Plaintiff contends that the hose fittings are independent "articles" rather than "parts" because they can be easily and quickly disconnected from a repaired hose (except the clinching couplings), and can be reused to repair other hoses.

I have concluded that the hose fittings in issue are parts of rubber or plastic hoses, and consequently are not classifiable as parts of household articles of metal, even assuming *arguendo* that the rubber or plastic hoses utilizing the fittings were chiefly used in the household.

The record shows that the couplings, menders and clamps were dedicated to use with rubber or plastic hoses, and that such fittings had no independent usefulness. While it may be true that the plain couplings, menders and adjustable clamps could be removed from one hose and reused on another hose, plaintiff's witnesses conceded—and Mr. Gadd testified—that once installed in a hose, the fittings normally remained attached thereto and became parts of the hose for its useful life (R.50–51, 89–90, 167). Additionally, it is obvious that when installed in a hose the fittings serve a useful function. Whether the couplings be of the "plain" or "clinching" type, they provide a means for a hose to be coupled to a water outlet, another hose, a nozzle or a sprinkler. The menders permit short lengths of hose to be joined together to form longer lengths, while the clamps provide the means for holding the plain couplings and menders in the proper position after insertion into the hoses.

In view of the foregoing facts, the hose couplings, menders and clamps conform to the criteria established by the judicial authorities for "parts". Hence, the fittings are dedicated to a sole specific use and serve a useful function when attached to the parent article. See *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849 (1964); *Trans Atlantic Company* v. *United States*, 48 CCPA 30, C.A.D. 758 (1960); *Border Brokerage Company, Inc.* v. *United States*, 58 Cust. Ct. 240, C.D. 2948 (1967).

## Strainer Bases

The sink strainer bases involved herein, as represented by plaintiff's exhibit 5, are claimed to be properly classifiable as sanitary wares

or parts of sanitary wares under item 653.95, TSUS. The following facts are established by the record: The strainer bases are dedicated solely to use in sinks. Upon installation, the base is permanently connected to the sink with a locknut and requires a watertight fit. Obviously, the base is designed to fit into the sink, and the outlet of the sink is specially designed to accommodate the base. Normally, after installation, the base remains installed in the sink for the life of the sink. The base serves an essential function in receiving and directing the flow of the waste water from the fixture into the drainage and waste system to which it is connected. Plainly, then, the sink is incomplete and will not operate effectively to discharge water into the drainage system without a device such as a strainer base.

There is no dispute between the parties that *sinks* are "sanitary wares", and defendant's witness Johnson so testified (R.190). In *The Westbrass Company* v. *United States*, 67 Cust. Ct. 334, 337, C.D. 4293 (1971), writing for the Second Division of the Court, I found: "The strainer base becomes a permanent part of the sink and directs water in the sink into the outlet drain pipe". Additionally, in *Hancock Gross Mfg., Inc.* v. *United States,* 60 Cust. Ct. 558, 565, C.D. 3459, 285 F. Supp. 168 (1968), the Court found that "the [strainer] base * * *, after installation, becomes a permanent part of a sink". Following the rationale of the parts cases cited *supra* in connection with hose fittings, clearly the strainer bases are parts of sanitary wares, viz.: sinks, and thus are dutiable under item 653.95, as claimed by plaintiff.

Even if the bases could be regarded as an auxiliary or optional feature of a sink (which I do not find), since they are dedicated to a sole specific use and serve a useful function when installed in a sink, they are "parts". *Gallagher & Ascher, supra* (auxiliary automobile heater, which was an optional feature that could be installed at additional cost over and above the basic price of the vehicle, held, parts of automobiles). Consequently, the facts that the strainer base is referred to in the plumbing industry as a "fitting", that it is not sold with the sink, and that it is not included in the price of the latter are not determinative of whether the base is classifiable as a part. *Cf. Victoria Distributors, Inc.* v. *United States*, 57 CCPA 76, C.A.D. 979, 425 F.2d 759 (1970); *Victoria Distributors, Inc.* v. *United States*, 57 CCPA 80, C.A.D. 980, 425 F.2d 763 (1970).

## CONCLUSION

In accordance with the stipulation of the parties, the snap-on type hose couplings 0424X and 0426X in entry No. 134705 are properly dutiable at the rate of 10 per centum ad valorem under item 654.20, TSUS, as modified by T.D. 68–9. For the reasons set forth above, the

sink strainer bases are properly dutiable at the rate of 11.5 per centum ad valorem under item 653.95, TSUS, as modified by T.D. 68-9, as claimed by plaintiff. Plaintiff's claims respecting all other merchandise are dismissed.

Judgement will be entered accordingly.